## T. Eborn v. Cannon's administrators.

1—When a jury was waived and the facts, as well as the law, were submitted to the court below, this court has less hesitation in revising its action than if there had been a finding of the facts by a jury.

2—A recital in a title bond of the payment of a certain consideration is not conclusive, but, at most, only *prima facie* evidence, either of the true amount of the consideration, or of the fact that it was paid.

3—Notwithstanding such recitals in a deed or a title bond, the consideration may be inquired into, and the facts with regard to it be proved by parol evidence.

4—If the statute of limitations had not barred a note when suit was instituted upon it, neither will it defeat a mortgage made contemporaneously to secure the note, although the mortgage was not set up in the original petition, but by an amended petition filed at a time when limitation would have barred the note if suit had not been brought on it. The mortgage, being but an incident of the debt, subsists as long as the debt does.

5—If it be alleged .that there is a mistake in the description of the premises mortgaged, and prayer be made for its correction, the statute of limitations can interpose no obstacle to granting the relief, provided the note secured by the mortgage is not barred.

6—It is always a question of fact what premises are mortgaged, and, in decreeing a foreclosure by sale, the court is bound to determine what premises are to be sold ; and, down to the rendition of the decree, the court should hear any allegation of mistake in the description of the mortgaged premises, and correct any error that may be made manifest by proof.

7—When suspicion is thrown by any proof, however slight, upon a recital of payment in a deed or other instrument, the burden of proving how the payment was made is devolved upon the party claiming the benefit of the payment.

8—All jurists agree that verbal admissions, though competent evidence, are to be received with great caution ; and in weighing conflicting testimony of them, it is important to consider and compare the circumstances and opportunities of the witnesses, to ascertain which of them gives the most correct version of the admissions.

9—A mistake in the description of premises in a deed must be clearly proved before a court will correct it.

10—In this case the {plaintiff alleged that, by mistake, the mortgage, in describing the land, called for the beginning point " at the N. W. corner

of the Cannon league," whereas it should have been, and was intended to be, the N. W. corner of the *lower half* of the Cannon league. To prove his allegation, he showed, by evidence, that at the time the mortgage was made, sundry third persons were occupying the upper half of the league, claiming to be the owners of it. *Held,* that this evidence was not sufficient to establish the allegation of mistake.

11—The authentication of claims against an estate, and their allowance by the administrator, do not prevent their application as set-offs, in a proper case.

CROSS-APPEAL from Travis. Tried below before the Hon. J. J. Thornton.

On the 5th of January, 1855, W. R. Cannon, the intestate of the defendants, made his two notes for $1000 and $40, respectively, payable to order of Samuel Lawler, and secured them by a mortgage on 1500 acres of the headright league of William Cannon. The mortgage described the land as "beginning at the northwest corner of said league, extending round nearly in a square form, or so as to include and make 1500 acres in said northwest corner of said league."

On the 31st of January, 1855, Samuel Lawler transferred the notes and mortgage to Thomas Eborn, the plaintiff in this suit.

On or about the last of November, 1856, Cannon died, and in 1857 administration on his estate was granted to C. R. Perry and Maria Cannon, the defendants in this suit, by the Probate Court of Hays county.

On the 1st day of April, 1858, Eborn instituted this suit in the District Court of Hays county, against the defendants, as administrators of W. R. Cannon. The notes and mortgage were the cause of action set up in the petition, which duly alleged the presentation of the notes to the defendants, and their rejection of them as claims against Cannon's estate.

In January, 1859, the defendants answered, and, after a general denial of the allegations made in the petition, averred that in the year 1855, the plaintiff, Eborn, bought from Cannon a part, supposed to be about three hundred acres, of the land covered by the mortgage, at the price of five dollars and fifty

cents per acre, for which land Cannon executed his title bond
to Eborn. That Cannon sold this land to Eborn for the pur-
pose of paying off the notes and mortgage sued on, and that
Eborn took the land in satisfaction of the notes and mortgage,
and agreed further to pay to Cannon, when a survey of the
land could be made, any surplus it might reach at $5 50 per
acre, over and above the notes and mortgage. That Cannon
was intoxicated at the time he made this title bond, and that
Eborn took advantage of his condition and inserted in it a
clause acknowledging the payment by Eborn to Cannon of
$1800, as the consideration for the land, whereas, in fact, no
consideration had or ever did pass except the notes sued upon.
They asked that a survey of the land be made, to ascertain
what surplus would remain after extinguishing the notes and
mortgage, and that their vendor's lien for such surplus be
enforced.

A survey of this tract being made under order of the court,
it proved to contain 434½ acres. On the trial, this title bond
from Cannon to Eborn purported to have been made on the
26th of January, 1855, which was five days before Eborn ob-
tained the notes and mortgage from Lawler.

On the 8th of September, 1868, Eborn, the plaintiff, amended
his petition and alleged that there was a material and uninten-
tional mistake in the mortgage, whereby the land was described
as being in the northwest corner of the Cannon league, when
it was intended to be described, and is actually situate in the
northwest corner of the lower half of the league; and he prayed
that the mistake be corrected, and the mortgage be foreclosed
on it when so corrected.

The defendants excepted to the amended petition, and also
filed a general denial, and pleaded the statute of limitations.

There appear in the record sundry other transactions and
dealings between Cannon and Eborn, which would be important
in a history of the case. But as the rulings of this court are
not materially affected by them, there is no occasion to give a
particular account of them. The evidence, both documentary

and oral, was very voluminous, and in many important respects very contradictory; but this court, in the opinion, has noticed it sufficiently for present purposes.

At an early stage of the case, the venue was changed from Hays county to Travis, where a trial was had at the Fall term, 1868.

A jury was waived, and the cause submitted to the court, who rendered judgment for Eborn for $1205 40, and foreclosed his mortgage as it appears on its face, and without correction of the alleged mistake as prayed for by the plaintiff.

Both parties appeal from the judgment to this court.

Very able briefs appear on either side, discussing the facts as well as the law; but their length precludes insertion of them entire.

*Hancock & West*, for Eborn. There is no evidence that Cannon had any interest in the upper part of the league, or owned it.

It is utterly inconsistent with Cannon's character that he would have mortgaged land that he did not own, and it is utterly improbable that a money lender like Lawler would have taken a mortgage, from Cannon, on another man's property; especially when it is shown that Cannon had land of his own, and that the mortgage was taken as it now reads, admits of no other rational explanation than that it was simply a misdescription in the deed, and was such a mistake as equity would and should relieve against.

On this point, before considering the question of limitation, it may be well enough to add briefly a few authorities:

"Sometimes by mistake the written agreement contains less than the parties intended; sometimes more; and sometimes it simply varies from their intent by expressing something different in substance from the truth of that intent. In all such cases, if the mistake is clearly made out by proofs entirely satisfactory, equity will interpose." (Story Eq. Juris., vol. 1, § 152.)

Also the same author, in the same volume, in section 162, says:

"Courts of equity will grant relief in cases of mistake in written contracts, not only when the fact of mistake is expressly established, *but also when it is fairly implied from the nature of the transaction.*"

Adams' Equity, marg. p. 172, and top page 412 of Wharton's ed., published in 1855, uses the following language:

"In addition to the cases of correction, on direct evidence of mistake, there are others where it has been *decreed on a presumption of equity.*"

The case of Gillespie v. Moon, 2 John's Ch. R., p. 585, *et seq.*, is very full and satisfactory on the subject of the proof of a mistake, and of the power of equity to relieve against them, or to correct them. As to the amount of the proof required, Chancellor Kent says the only question is, "*Does the proof satisfy the mind of the court?*" He goes on to say:

"In Simpson v. Vaughan, 2 Atk., 31, and Crosby v. Middleton, Prec. in ch. 309, and Burns v. Burns, 3 Vesey, 573, a mistake in a bond was shown by parol proof, on the part of the plaintiffs, *though in two of these cases the obligor was dead, and in the third the lapse of time had been very great, and the party against whom the correction was allowed was a surety.*" He goes on in the same case to observe:

"*Defects in mortgages,* contrary to the intention of the parties, have also been made good against subsequent judgment creditors, who came in under the party who was bound in conscience to correct the mistake."

That mistakes are cognizable in equity, and can there be corrected and relieved against, is an elementary principle. (Mitford's Pl., marg. p. 16; 1 Vesey, marg. pp. 317, 457; Atk., p. 31; 6 Vesey, p. 328.)

That parol evidence can be let in to explain a mistake in a deed, is now universally conceded.

In Texas, parol evidence has been admitted to prove a deed, absolute on its face, was executed upon certain trusts and con-

ditions; (Mead v. Randolph, 8 Tex., p. 195; McLenny v. Floyd, 10 Tex., p. 163); and such resulting trusts, so established by parol, have been frequently enforced by our courts: parol proof has also been frequently allowed, to show a deed absolute on its face, was in fact a mortgage. (Heatherly v. Record, 12 Tex., p. 50, and Stampers v. Johnson, 3 Tex., p. 1.)

In all such cases as in cases of mistake, it is conceded that the proof must be clear and convincing; but by a comparison of the cases above cited with the facts in this case, it will be seen that a trust, a fraud, and a mistake, have all been declared and relieved against on proof less convincing, and more conflicting, than the evidence adduced in the present case.

In the case of Austin v. Ewell, 25 Tex. Rep. Supplement, p. 403 *et seq*, the court corrected a mistake in an agreement as to real estate, and decreed a specific performance, in accordance with the true intent.

In Urquhart v. Burleson, 6 Tex. R., p. 502, our court say that a mistake made by a surveyor in his field notes, and actually carried into and perpetuated in the patent itself, may be relieved against, and equity will give the patentee the land actually surveyed, though it be different from the land described in the patent. (See also Parsons v. Roundtree, 1 Hayward, p. 378, No. Ca. Rept.)

In regard to the law of mistake, as expounded in Texas, the attention of the court is also called to the following cases, which will throw some light on the question:

Kesler v. Zimmerschitte, 1 Tex. R., p. 50; Cannon v. Hemphill, 7 Tex. R., p. 184; Lewis v. San Antonio, 8 Tex., 288.

In order to defeat the foreclosure of the lien on the premises actually mortgaged according to the intention of the parties, the defendants pleaded the statutes of limitations of three months, of two years, and of four years, to the amendment setting up the mis-description, and asking for its correction.

The statute of three months pleaded, was that section of the Probate Law (Pasch. Dig., Art. 1411, p. 314), which requires suit to be brought on a rejected claim within three months

after the date of the rejection. The claim in this case was rejected on the 18th of January, 1858, and suit was brought on the 15th of April, 1858, in less than three months from the date of the rejection.

The plea, then, if it have any merit, must proceed upon the assumption that the mortgage by which a note or claim against a deceased person is secured, has to be presented to the administrator or executor for acceptance or rejection—

But in Dansey v. Swinney, 7 Tex., p. 617, our court discuss the matter, and come to the conclusion that it is sufficient if the note to secure which the mortgage or trust-deed was given, is proved up and presented.

In the case of Cundiff, adm'r, v. Simpson, Tyler term, 1869, Pamphlet Decisions, p. 3, it was expressly held, by the present court, that the mortgage need not be presented to the administrator, but only the "claim for money," the court remarking, "The probate judge, and not the administrator, has jurisdiction relative to the mortgage." It is plain that the plea of three months limitation was inappropriate; nor are we able to understand how the statute of two years or four years could be made to apply.

There is certainly no express statute, in this State, that after the lapse of two years, or after the lapse of four years, from the date of the discovery of a mistake in a trust-deed or a mortgage, that the right to have it corrected in equity is barred. There is, as we understand it, no other rule of limitation applicable to a lien, mortgage or trust-deed, than that which applies to the contract out of which the lien itself springs. A judgment is barred in ten years, and after that lapse of time its lien ceases, and not before; a note secured by mortgage or trust-deed, or unsecured, is barred after the lapse of four years from its maturity, and with the completion of the bar on the note, the mortgage also ceases to exist. But we know of no case in which the lien could be barred by lapse of time alone, while the contract out of which the lien arose was unaffected by the lapse of the same period. The mort-

gage is but an incident of the debt it is intended to secure, and has no existence independent of, and can not survive it; and so completely is it dependent for its existence on the debt, that in equity the payment of the debt is an absolute extinguishment of the mortgage, without so much as a written release of it from the mortgagee. (Duty v. Graham, 12 Texas, 427.) The debt being barred by limitation, the mortgage ceases to exist. (Ibid.) And, on the other hand, so close is the relation between the mortgage and the debt, that a revival of the debt, after the bar of the statute is completed, will, by virtue of the new promise, revive the mortgage or lien, without any express words to that effect. (See Perkins v. Stene, 23 Texas, p. 561.) Such being the relation between the note and the mortgage, and the latter being uniformly treated as a mere incident of the former, it is hardly possible to conceive of a statute of limitation which would bar the right to resort to your security to collect your debt, while the debt itself was wholly unaffected by the lapse of the same period.

It seems to us a novel doctrine that there is a distinct and different statute of limitation applied to a mortgage from that applied to the debt it secures.

The defendants below adduced but a single authority on the question, and that upon examination will be found not only to give no countenance to the position assumed, but to proceed upon the idea that, inasmuch as the cause of action was barred, the court would not correct the mistake. The case alluded to was that of Smith v. Fly, 24 Texas, 345.

That was a suit brought to recover damages for an alleged deficiency of one hundred and fifteen acres in a tract of land purchased by the plaintiff of defendant. The court held that, to recover back the purchase money thus overpaid, the purchaser must resort to a court of equity for relief against the mistake which had been carried into the deed. The court, in that case, held that, inasmuch as if he had sued at law for money had and received, the two years' statute would have barred his right of action; so that, by analogy, when he

sought to correct the mistake in the deed in equity to obtain practically the same purpose as that sought in his suit at law, the same limitation of two years was held to apply in equity.

The case at bar we respectfully submit, of a mistake in a mortgage, where the debt it is intended to secure is not barred, is wholly different from the case cited and relied on. Here, if the note secured by the mortgage was barred, why, then, all right of action to correct mistakes in the mortgage might very well be barred also, but not otherwise. (Ross v. Wallace, 28 Texas.) We confess that we are at a loss to see how the case of Smith v. Fly was turned into authority against us; yet, it was done, and was, no doubt, the reason why the court turned, apparently, a deaf ear to all the parol evidence introduced explaining the mistake, and eventually refused, in the decree complained of, to correct it.

The evidence in this case furnishes an instance to which the rule in Smith v. Fly, 24 Texas, may very well apply. It is Eborn's purchase of the 20th of March, 1855, of a tract of land, supposed to be three hundred acres, at the rate of $5 50 per acre, for which he paid in cash $1650. The survey proved to contain only two hundred and nineteen acres, falling short eighty-one acres, and showing an excess of payment by Eborn to the amount of $446, which sum was justly due to him.

But to a suit for which, as for money had and received, the rule of limitation laid down in Smith v. Fly might very well apply, and it was so applied by the court in this case.

It may have been this fact that induced the court to make the erroneous application of the same rule to a mistake in the description of the mortgage, when the note, to secure which it was made, was not itself barred.

In speaking of the application of the doctrine of *laches*, or lapse of time to bills to correct mistakes, Chancellor Kent, in the case of Gillespie v. Moon, 2 John's Ch., p. 602, heretofore cited, says:

"Courts have been liberal on this head. A mistake was rectified, after seven years' acquiescence, in East v. Thorn-

bury (3 p. Trans., 126), and if Lord Hardwicke refused it in
Bell v. Cundell, *it was after a lapse of forty-four years, and
there was an innocent purchaser without notice in the case.*"

With these remarks we dismiss from further consideration
the error of the court in not correcting the mistake, and
properly foreclosing the mortgage in accordance with the true
intent of the parties. The original petition, though it defect-
ively described the mortgaged premises, was sufficient to stop
the running of the statute of limitation, if there was any such
statute in the case. (See Scoby v. Sweatt, 28 Tex., p. 713.)

As to when drunkenness will vitiate a contract, see 1 Story's
Eq. Jur., §§ 231, 230. The plea was wholly unsustained by
proof, measured by the rules there laid down.

Again, some question may be made as to the sufficiency of
the proof adduced, to show that the land described in the
mortgage did not belong to Cannon at the date of the trust deeds.
It is true the deeds of Mr. Stanley, Mr. Choate, Mrs. Wilson
and others to the upper half of the Cannon league, not being
under the control of the plaintiff, were not introduced; but
other evidence of title and ownership was offered which went
to the court, and properly too, without exception, to show their
ownership of the upper half of the league; and in the atti-
tude of the case as presented no higher evidence of title in
them was needed. The title to the upper half of the league
was not the subject matter of the suit, and the ownership of it
was merely a collateral issue in the case. Under such circum-
stances, and in many like cases, much less strictness in the
proof of title is required, than would be in an action of tres-
pass to try title, bill of peace, etc. Starkie's Ev., vol. 1, top
p. 450, and marg. p. 451, says: "Mere matter of inducement
need not be precisely proved," and the same rule has been
applied to the minor issues on trial.

Where the title to the land is not brought in question, as it
is in ejectment and other real actions, title is frequently
proved from acts of dominion, possession, and ownership, and
the like; and in vol. 2, part 2, top p. 1125, and marg. p. 1126,

Starkie says: "Where a reasonable probability exists that a particular piece of land belonged to a certain person, acts of ownership done on other parts are admissible to show what his right is." And on the same page, and in the same connection, he remarks: "Where the question was whether a slip of land between an old enclosure and the highway belonged to the lord of the manor or the owner of the adjoining land, *held that acts of ownership* by the lord of the manor, as inclosure, etc., were properly admitted."

Again, on pages 1126, 1727, the same author says: "The cutting down trees by the side of a highway, and clearing the way, are evidence of the ownership of the soil."

Mathews, in his work on Pres. Ev., p. 31, says: "*Possession is not unimportant as an evidence of title to land.*"

"Possession," he says, "is considered often *prima facie* evidence of title to land, so much so that *mere occupancy* will support an action of ejectment against one who can not show a superior right."

In Chitty Pl. vol. 1, p. 379, the doctrine is laid down that in actions growing out of trespasses to realty, possession is sufficient evidence of title as against a trespasser.

There can be no doubt that the evidence in this case, under all the circumstances, was ample that Cannon owned no land in the northwest corner of the league, and that it was held and claimed by others at the date of the mortgage, coupled with the fact that if he owned the land he could at once have produced his title.

Chitty, in vol. 1, p. 379, observes: "In trespass for a wrong done to real property, a special or particular title need not be set out, and under it *any title or evidence of possession* may be given."

*Chandler, Turner & Carleton*, for Cannon's administrators, very thoroughly discussed the facts.

LINDSAY, J.—This is one of those cases which depends mainly upon the evidence for its determination in this court.

XXXII—15.

There is no matter of law, as applicable to the facts adduced on the trial, that involves any serious difficulty. A jury was waived on the trial, and both the law and the facts of the case were submitted to the consideration of the court. This court, therefore, has the less hesitancy in revising the action of the court below upon the *facts* of the case, as well as upon the law.

This suit was brought by the assignee of two notes, executed and delivered to Samuel Lawler by the intestate of the appellees, on the 5th day of January, 1855, for the sums of $1000 and $40 respectively, and secured by a mortgage, of even date with the notes, on 1500 acres of land. The defense is, substantially, payment of the notes sued on, by the sale of a tract of land containing 434½ acres, by the obligor to the assignee, the purchase money of which was applied in liquidation of the indebtedness. If the payment was so made, it has become a complicated question, from the assignment and transfer of the notes and mortgage having taken place five days subsequent to the date of the written evidence of the contract of sale of the land. The bond for title to the land bears date January 26th, 1855; and the assignment of the notes and mortgage bears date January 31st, 1855. Besides which anachronism, if it be a payment, there is, in the title bond of the vendor, an acknowledgment of the receipt of $1800 of the purchase money for the land; rating the price of the land at five dollars and a half per acre, and reserving the residue of the purchase money to be determined by a future survey. This state of facts, as shown by the written evidence, complicates the question, and must be explained by oral testimony to relieve it of embarrassment.

It may be affirmed, that, as a matter of law, generally settled in American courts, this recital in the title bond is not a conclusive presumption of payment. At most, it is only *prima facie* evidence of the amount paid; or, that there was any payment at all. Whether in a deed, or a title bond, in an actual conveyance, or an obligation to convey, the consideration may be inquired into; and the grantee may recover back

the consideration upon the covenant of warranty, or the grantor, by our special action on the case, may recover the purchase money actually unpaid, whatever may be the recitals in the instruments.   So that the mere recital of payment in the deed, or bond, does not operate as an estoppel.   The fact of payment is a legitimate subject of inquiry in each, notwithstanding such recital.   A party would be estopped to deny the *obligation to convey*, or the conveyance *for a valuable consideration*, because these being the special objects of the instruments, to which the solemn attention of the makers is peculiarly addressed at the time of their execution, are facts against which no averments should be allowed.   The consideration, however, in each of them, may be inquired into, and the payment established, or repelled by parol proof.   The recital has no more force or effect than a common receipt, which, it is universally conceded, may be explained or set aside by parol evidence.

The court is satisfied, according to the well settled law of the land, that, in defense of the action upon the notes and mortgage, the party was authorized to go into an explanation of the recital of payment, in the title bond for the conveyance of the land.   It was alleged in the answer that the land had been sold to the assignee of the notes, in consideration that he would pay off the notes, and thus release the mortgage.   And this was the line of defense adopted.   It was insisted that, in fact and in truth, the plaintiff, in purchasing and paying for the notes and mortgage, had in this way paid the purchase money for the land, and thus became entitled to a credit *pro tanto* with his vendor upon his purchase of the land, and that the acknowledgment in the bond had been made in contemplation and in anticipation of the settlement of the notes by the vendee—that no money was actually received by the vendor.

Upon the setting up of this defense, the plaintiff reaffirmed his cause of action by an amendment of his petition, in which he asked a specific enforcement of the contract of sale according to the title bond, and the correction of an alleged mistake

in the description of the mortgaged premises. The defendants resisted the correction and foreclosure of the mortgage, upon the ground that when the amendment seeking the correction and foreclosure was filed, it was a new cause of action set up, and was then barred by the statutes of limitation.

If the notes were a subsisting debt at the time of the institution of the suit, not barred by the statute of limitations, the mortgage, executed cotemporaneously to secure their payment, was still valid, as long as the debt remained unsatisfied. No matter at what time the power of the court was invoked for its correction and foreclosure, and for a decree to subject the mortgaged property to the satisfaction of the debt, it was opportune, if the jurisdiction of the court over the debt itself was not ousted. The mortgage was but an incident of the debt; and the incident, in law as in logic, must abide the fate of its principal. It is always a question of fact, as to what may be the mortgaged premises. The mortgage is valid so long as the debt subsists. And at the time of adjudication the court is bound to determine what premises are to be sold; and the ear of the court ought always to be open to hear, and its hand ready and prompt to act upon and correct any mistake or error which may be made manifest by proof, up to the moment of its final decree. Whenever the facts are so presented, the court must take cognizance of them, and remove every obstruction; yet, in such a manner as not to compromit the rights of strangers to the record. The statute of limitations does not affect the question.

It is certainly true, as asserted by counsel, that, by the common law, all sealed instruments, deeds, etc., import a consideration. And it is also true that, in its strictness, it would forbid an inquiry into the truth of the recitals in a deed. This doctrine still obtains in England, and in one or two of the American States, where they have no such statutes as our statute of 1858. With them the recitals in a deed are conclusive upon the parties to the deed. But American authority generally, in regard to recitals in deeds, is adverse to the Eng-

lish doctrine. Almost universally in the American States, whether they have a statute like our statute of 1858, or not, courts consider such recitals as only *prima facie* evidence of the fact recited. Every enlightened jurist cannot but concur in deprecating the confusion, superinduced in the construction and interpretation of written contracts, in consequence of dispensing with seals, and of everything of a like import, in certain instruments. The result has been to perplex and confound the clear conception and satisfactory elucidation of the legal effect of many sealed and unsealed instruments. Such innovations upon long-established rules, which have become thoroughly interwoven into the very framework of the judicial system of a country, are rarely duly weighed and considered in the hasty legislation of crude reformers; and the resulting mischief in complicating questions, and in multiplying the uncertainties of judicial administration, often largely overbalance the imagined benefits from a change.

The well settled principles of the law, therefore, authorizing an inquiry into the truth of the recital in the written contract, upon the subject of consideration, and an investigation of its nature and character, though it purports to have been a payment in money, it is necessary to examine the evidence adduced on the trial, to determine upon its weight and sufficiency to counterbalance, or modify, or explain the acknowledgment of payment in the title bond. And here it may be remarked, that it is a rule of law, when suspicion is thrown, by any proof, however slight, upon the recital in the instrument, the burden of proving how the payment was made, is devolved upon the party claiming the benefit of such payment. This proof was not made, but the party rested upon the recital in the bond, coupled with the admissions offered as rebutting evidence to the proof adduced by the opposite party, showing affirmatively how that payment was made.

The evidence is composed of the depositions of ten living witnesses, who were called upon to testify some ten or eleven years after the occurrence of the incidents of which they speak

—three of whom testified alone as to the personal habits, character and condition of the obligor in the title bond. These latter witnesses bear testimony that he was a man of very intemperate habits, of good intellect, but careless and extravagant; and when he had confidence in a man, credulous and trusting. None knew his actual condition at the time of the execution of the title bond. The other seven, equally ignorant of his condition at the time of the execution of the instrument, all testify as to admissions made by the one, or the other, of the parties, subsequent to the date of the title bond. This, it must be borne in mind, is a species of evidence which, though held competent by the law, is regarded as the weakest of all human testimony: because it is the mere repetition of oral statements, subject to much imperfection and mistake, from the party, perhaps, not being clear and explicit in his meaning, and from the unintentional alteration of expressions really used, which may vary the import of what may have been actually said. All courts and jurists concur in the opinion, that verbal admissions are to be received with great caution. Still, such evidence is held competent by the law. In weighing, then, the conflicting statements of witnesses (and such is their character in this case), it becomes the duty of the court to examine and compare the circumstances in which each of the witnesses was placed, and to ascertain, if possible, which had the better opportunity of understanding clearly and distinctly the *factum probandum*, and was most likely to be impressed with the precise character of the admissions; so that the greater probability may be attained of the true nature of the transaction upon which the admissions were predicated. To a mind in any degree familiar with the philosophy of human testimony, there can be but little difficulty in coming to the conclusion that Samuel Lawler, who assigned and transferred the notes and mortgage to the appellant, only five days after the execution of the title bond, occupied a position, and was attended with those concomitants, which would give him a more distinct apprehension, and would more indelibly impress his mind with

the true state of the transaction, than the fugitive and evanescent language uttered afterwards in the hearing of others, without any special incident, circumstance or interest to fix the attention of the hearers. Samuel Lawler testified, that the appellant paid him the money on the notes; and the witness at the assignment and transfer "gave up to (him) Eborn," the said notes and the mortgage, and assigned them to him, he stating that the money he paid to me (Lawler, the witness,) was to go towards paying for the land that he bought of Cannon." This witness fixed the precise date of this statement. His memory was refreshed by the date of the assignment and transfer. It took its reckoning from that event, and by the law of mental association the incidents of that moment were revived in his recollection, and no right-judging mind can forbear to give more credence to such testimony than to the vague recollections of those who could fix no dates nor recur to any certain incidents or epochs which were calculated to fortify and give a semblance of absolute verity to their statements. This arrangement, which is testified to by Samuel Lawler, is corroborated by his son, J. W. Lawler, who says he was present when Cannon and Eborn made the arrangement in the trade for the land, and that the agreement was that Eborn was to pay the notes, "lift the mortgage," and take the land in compensation for his extinguishment of the notes due from Cannon to Lawler. There being nothing to fix his memory as to dates, he necessarily spoke vaguely as to the time when this transaction took place. From recollection he could only state the time approximately; but to give it any significance, it must have been anterior to the actual payment of the notes and the lifting of the mortgage. By supposing a like error in dates from lapse of memory in other witnesses, all the testimony might be brought into harmony, and thus save them all from the uncharitable inference of false swearing—a rule of interpretation which both law and morality strongly inculcate. The father was corroborated in his testimony by another son, who was also vague and indefi-

nite as to amounts and dates as others, but was unequivocal as to the substantive fact that Eborn had got land from Cannon to settle the Lawler notes and "lift the mortgage." These are positive, affirmative facts, not altogether or entirely dependent upon verbal admissions, for one of these witnesses says he was present when the agreement was entered into between Cannon and Eborn.

Now, this testimony, if true, shows conclusively, that Cannon's liability on the notes was released, the debt extinguished, and the mortgage, as an incident to the debt, was released with it. The testimony of the other witnesses, as to verbal admissions, made sometime afterwards by Cannon, is of that vague, unsatisfactory character which renders it peculiarly obnoxious to that cautionary admonition given by elementary writers upon evidence, and usually embodied in the charges of all enlightened courts to juries.

The court, after a full survey of all the evidence, a careful analysis of it, and a calm consideration of its weight and bearing, is brought to the conclusion that at the institution of this suit the two notes which had been given by Cannon to Lawler, were not a subsisting debt against the estate of Cannon; and that the administrators had good and sufficient reasons for rejecting them, as an improper claim against their intestate.

But, as the mutual responsibilities of these parties have been brought up in review before the court in this case, and, as the District Court had original as well as appellate jurisdiction in all matters pertaining to the administration of decedents' estates, it is right, and it is the duty of this court, in order to put an end to litigation between them, to settle and adjust, by the decision here, all matters in any way involved in this controversy.

Before proceeding to make such settlement and adjustment, however, the question of the mistake, as to the *locus in quo* of the mortgaged premises, must be disposed of. The argument upon the proof of mistake is plausible, but it is by no means

satisfactory. About the power and authority of the court to correct the mistake in this trial, this court does not entertain a doubt. But, then, the court considers the evidence insufficient to establish the mistake beyond a reasonable doubt. The residence of other parties upon the upper half league, with a claim of right, was, by no means, totally incompatible with the right of Cannon to give a mortgage upon that half of the Cannon league. It might be true that others were in possession of it, and, yet, the title and right of property might be in Cannon. From this defect of evidence, the court would be debarred from making any correction in the deed of mortgage, if mistake there be. In any event, however, the conclusion about the notes would dispense with the necessity of the correction, if the mistake were satisfactorily proved. It may be said, also, in reference to the deed for sixty-two and a half acres, and the deed of the 30th of March, 1855, they are not really in litigation in this suit, since there is no proof that the consideration for which they were given was not paid. The party is precluded from recovering on his drawback for the eighty-one acres in the deed of the 30th of March, 1855. In fact, these cases are not involved in the equities of the suit brought, but are rather introduced as evidence for the elucidation of the real point in issue between the parties. If it were otherwise, the case of Smith v. Fly (24 Texas, 345) would prevent a recovery.

It appears, then, that at the date of the execution of the title bond, giving the appellant credit for the $1800, he was still indebted to Cannon for the residue of the land, at the price stipulated, in the sum of $589 $\frac{75}{100}$, but, at the time, he was legally bound, as surety for Cannon, in various sums, which he afterwards was compelled to pay—the principal and interest of which, at the time of actual payment, operated, in equity, as an extinguishment of so much of the principal and interest of his indebtedness on the land, and which was an equitable set-off against the land debt. The authentication and the allowance of these claims by the administrator do not

prevent their application as an equitable set-off in dispensing justice between these parties. If Eborn, twelve months after the death of Cannon, had paid, as his surety, precisely the amount then due upon the land, equality, the very basis of equity, would have been attained, and there would have been no longer cause for litigation between them. With the adjustment of these equitable set-offs of the surety payments against the residue of the purchase money for the land, Eborn will be the equitable owner of the four hundred and thirty-four and a half acres of land, for which he should have the legal title. The judgment of the court below is accordingly reversed and reformed.

Reversed and reformed.

MORRILL, C. J.—Agreeing in the general result of the decision and reasoning in this case, I beg leave to dissent so far as relates to what is stated relative to the supposed superiority of sealed instruments, and so far from regretting that seals and scrolls were abolished by the act of 1858, I regret that it was ever deemed necessary to introduce scrolls or seals, and making any distinction in instruments having and not having a scroll or seal annexed to the name or names of the maker.